

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| MRC PERMIAN COMPANY, | § | |
| Appellant/Cross Appellee, | § | |
| | § | No. 08-19-00124-CV |
| v. | § | Appeal from the |
| POINT ENERGY PARTNERS PERMIAN LLC; TJ BAR, LLC; TUBB MEMORIAL, AN OREGON LIMITED PARTNERSHIP; PLAINSCAPITAL BANK, TRUSTEE FOR THE DEBORAH JACKSON REVOCABLE TRUST; BANK OF AMERICA, N.A., TRUSTEE FOR THE JANELLE JACKSON MARITAL TRUST PART M2, JANELLE JACKSON MARITAL TRUST PART M1, AND FAMILY CREDIT SHELTER TRUST PART B; VORTUS INVESTMENT ADVISORS, LLC; JOHN SABIA; and BRYAN MOODY, | § | 143rd District Court |
| | § | of Loving County, Texas |
| | § | (TC# 17-06-869) |
| | § | |
| | § | |
| | § | |
| | § | |
| Appellees/Cross-Appellants. | § | |
| | § | |

## **O P I N I O N**

The opinion of the Court issued March 15, 2021 is withdrawn, and the following is the opinion of the Court.

This permissive appeal[1] arises in the context of competing oil-and-gas leases covering certain acreage located in Loving County, Texas. Below, the trial court ruled on a number of competing motions for summary judgment—granting some and denying others—and permitted the parties to pursue an interlocutory appeal with respect to what it identified as three controlling questions of law. Those questions are: (1) whether the original leases were perpetuated in their entirety by the operation of their force majeure clauses, (2) if the original leases terminated, what acreage was retained in Production Units under those leases, and (3) if the leases did not terminate, whether the original lessee had valid claims of tortious interference against certain defendants.

We agreed that answers to the three identified questions of law would form a basis for either affirming or reversing most of the trial court's summary judgment rulings, and therefore granted permission for the interlocutory appeal.[2] In answering the controlling questions, we first conclude that there is a genuine issue of material fact as to whether the original leases were perpetuated in their entirety by the operation of their force majeure clauses, such that the trial court's summary judgment ruling on this issue in favor of the defendants was error. We do not reach the second question because it is not ripe for decision due to the factual dispute arising in the first question. In response to the third question, we similarly determine there are genuine issues of material fact as to the original lessee's claims of tortious interference, except to the extent those claims are made against a mineral owner for allegedly interfering with its own lease.

The answers to these questions produce mixed results as they relate to the trial court's

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014; TEX. R. APP. P. 28.3.

[2] The trial court's granting of Defendants' Joint Motion for Summary Judgment on Plaintiff's estoppel claim does not appear to be dependent upon our answers to any of the controlling questions of law raised by the trial court and certified by this Court, nor was the issue briefed by either party. As a result, this ruling by the trial court remains an interlocutory order not subject to review in this appeal.

rulings on summary judgment, as explained in greater detail below. In sum, we affirm in part and reverse and remand in part.

## I. BACKGROUND

### A. The Parties

The original lessee of the subject tract[3] is Appellant MRC Permian Company (MRC), who filed suit to protect its leasehold interests arising from leases executed with four mineral estate owners. Each of the four mineral owners executed their respective lease with MRC through an agent or trustee. The Lessors and their representatives include the following: (1) TJ Bar, LLC (through its agent Holland Acquisitions, Inc., d/b/a Holland Services[4] (Holland)); (2) Tubb Memorial, LP (through its agent Bank of America, N.A.); (3) Bank of America, as trustee for three related trusts under the James D. Jackson Trust Agreement; and (4) PlainsCapital Bank, as trustee for The Deborah Jackson Revocable Trust (PlainsCapital).

The primary defendant in the case below is the subsequent lessee of the same minerals, Point Energy Partners Permian, LLC (Point Energy). Other defendants include the mineral owners and their representatives listed above, as well as John Sabia and Bryan Moody—both of whom are principals of Point Energy—and Vortus Investment Advisors, LLC (Vortus), a financial backer of Point Energy.

### B. The MRC Leases and Drilling Operations

---

[3] The subject tract is almost 4,000 acres situated in Loving County, Texas.

[4] Holland was originally a party to this appeal, however, during the pendency of the appeal, Holland notified this Court of its filing for Chapter 7 bankruptcy, pursuant to TEX. R. APP. P. 8.1. As a result, the appeal as to Holland was severed into a separate cause number and stayed, pursuant to 11 U.S.C. § 362, TEX. R. APP. P. 8.3, and *In re Southwestern Bell Tel. Co.*, 35 S.W.3d 602, 604 (Tex. 2000) (orig. proceeding). The cause number of the severed appeal is 08-21-00065-CV. Although Holland may be referred to in this opinion in order to provide background, no part of this opinion shall be interpreted as deciding issues as to Holland.

3

The original leases between MRC and the mineral owners were executed on February 28, 2014. Per lease terms, MRC obtained the exclusive right to drill for a three-year primary term expiring on February 28, 2017. Upon expiration of that period, MRC's interest automatically terminated "as to all lands and depths of the Leasehold Estate not then included in a Production Unit containing a Commercial Well . . . ." The lands and depths included in a production unit would then be subject to the secondary term of the lease, which would last "as long thereafter as oil or gas are produced from the Leasehold Estate in paying quantities . . . ." MRC could also suspend the automatic termination of the primary term by conducting a continuous drilling program, as defined by further lease terms.[5] Under that program, so long as MRC began actual drilling[6] of a new well within 180 days from the commencement of its drilling of a previous well, it maintained the leasehold estate for further development of new production units. Within industry terms, this type of continuous drilling requirement is known as "spud to spud" drilling.[7]

Relevant here, the lease included a force majeure clause providing that MRC could extend

---

[5] "Continuous Drilling Program" is defined by the lease as: "the period of time during which Lessee is timely commencing Actual Drilling of Continuous Program Wells and ending on the calendar day upon which more than 180 consecutive days have elapsed since the commencement of Actual Drilling of the most recent Continuous Program Well without the commencement by Lessee of Actual Drilling of a further Continuous Program Well; provided, however, if Lessee commences Actual Drilling of a subsequent well in the Continuous Drilling Program sooner than 180 days after the commencement of Actual Drilling on the immediately preceding well, Lessee shall be given credit for the unused days up to a maximum of 90 days per well, and Lessee may accumulate these unused days and apply them to delay the time in which Actual Drilling of one or more subsequent Continuous Drilling Program Wells must be commenced, it being intended that the average time period between commencement of Actual Drilling of Continuous Program Wells shall not exceed 180 days but that Lessee shall have the flexibility set out above if Actual Drilling of one or more Continuous Program Wells is commenced early."

[6] As for "Actual Drilling," the lease provides that the term "shall be considered to have commenced on the calendar day that the drill bit attached to a Capable Drilling Rig first penetrates the ground at its wellbore's surface location."

[7] "Spudding-in" means "[t]he first boring of the hole in the drilling of an oil well." *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 19-1054, 2021 WL 1323406, at *1 n. 1 (Tex. Apr. 9, 2021) (quoting P. Martin and B. Kramer, *Williams & Meyers – Manual of Oil and Gas Terms* 1007 (16th ed. 2015).

any continuous drilling deadline in the event of a non-economic event beyond its control which delayed its operations. So long as MRC furnished the lessors a reasonable written description of the problem encountered within 60 days after its commencement, the lease would remain in force and effect during the continuance of such delay and up to 90 days after the removal of the force majeure.

By February 28, 2017—the date the primary term was set to expire—MRC had successfully developed five wells on the leasehold estate. MRC had begun drilling the last of the primary-term wells on November 22, 2016. To extend the lease under the terms described above, the continuous drilling program required that MRC either begin drilling another well by May 21, 2017 (180 days from the spudding date of the previous well), or otherwise give timely and proper notice of a qualifying force-majeure event. Again, failure to do one or the other would result in automatic termination of MRC's leasehold interest with the Lessors except for all lands and depths then included in the production unit of a developed, commercial well.

It must be noted that under the terms described above, if MRC encountered a qualifying force-majeure event within 60 days of a continuous-drilling deadline, it would not be contractually obligated to provide notice of the force majeure until after the continuous-drilling deadline had passed. In such a case, built into the timelines established in the lease was a period where MRC could believe the lease was still in effect given the force majeure extension, but the Lessors might not yet be aware of such extension and prematurely believe the lease had terminated as to all acreage not then included in a production unit. As a result, when a force majeure event becomes of issue, the Lessors would not know for certain whether their leases had terminated until 60 days after MRC's failure to spud a new well by a continuous-drilling deadline. As it turned out, this is

5

exactly what MRC claims happened.

Billy Goodwin, an MRC executive with 25 years' experience in operations located all over the world, testified about the higher-than-normal pressures encountered by drillers when operating in Loving County or the Delaware Basin, as a whole. Because of these challenges, MRC used a specific rig—"Rig 295"—for drilling wells in the area, and it planned on continuing to do so for the next well it drilled on the leasehold estate. Goodwin described that Rig 295 was equipped with more experienced crewmen and specialized equipment. This rig had successfully drilled other wells off the acreage of the leasehold, including the Dorothy White #124, a horizontal well. To drill on the leasehold, MRC approved the scheduled spudding of its next new well, the Toot #211, on May 11, 2017; however, because of an administrative error, MRC later delayed Rig 295's spudding of Toot #211 until June 2017, which was beyond their continuous-drilling-program deadline.[8]

Yet, on April 21, 2017, while drilling another horizontal well nearby but off the leasehold estate, Rig 295's operations were otherwise delayed when the production casing on that well was compromised; and, consequently, there was unexpected wellbore instability that needed to be addressed. Rig 295 resolved the instability through a reaming process, which resulted in a roughly thirty-hour delay.

On June 13, 2017—53 days after the delay—MRC gave notice of the events recounted above by sending a letter to all four Lessors via their representatives. Notably, the date of MRC's

---

[8] Expert William Keffer testified in his video deposition that "there was some sort of calendaring error" that occurred within MRC that caused the company to schedule drilling in June 2017—one month after the lease termination date of May 2017. Moreover, Glenn Stetson, an asset manager and team lead for MRC, conceded in his deposition that this calendaring error was a mistake that he thought was his fault.

letter was within the 60-day window required by the force majeure clause but after MRC's continuous drilling deadline of May 21, 2017. MRC asserts that the thirty-hour delay on April 21 was a qualifying force majeure, being a noneconomic event beyond MRC's control. MRC further asserts that it gave timely and proper notice of the force majeure event, pursuant to Paragraph 13 of the lease. Also in the letter, MRC estimated that the rig would be arriving on the leasehold estate to drill the new well as early as the following week.

On June 15, 2017, Point Energy, through Bryan Moody, responded to MRC's letter to the mineral owners. Moody's letter stated "[t]he primary terms of [MRC's] leases have expired, and MRC is obligated to release all of its interest in the leases outside specified production units in the Lands upon the conclusion of the Continuous Development Program set out in the leases." Point Energy's letter then informed MRC that it had reviewed publicly available drilling data and conducted "a diligent review of the applicable facts and circumstances . . . ." The letter questioned whether MRC's drilling schedule had been sufficient to maintain the continuous development program. It then disclosed and gave notice that it had not only taken new leases from the mineral owners it had also acquired their rights to seek termination of MRC's leases. Point Energy asserted that neither it nor the mineral owners saw how MRC's alleged facts, even if true, fell within the plain language of the force majeure clauses in MRC's leases and could act to extend the continuous development program. Moody concluded by stating: "Given the concerns of [Point Energy] and the mineral owners, unless you can provide sufficient information and explain how MRC has complied with the Continuous Development Program, we have serious concerns that any entry onto the land to drill the Toot 211 may constitute bad faith trespass."

7

## C. MRC Files Suit

Five days after Point Energy's response, MRC filed suit against six named parties: TJ Bar LLC, Tubb Memorial LP, PlainsCapital Bank, Bank of America, Holland, and Point Energy. To protect its leasehold rights, MRC sought declaratory judgment on its invocation of the force majeure clause to extend the drilling deadline. MRC also sued Point Energy and Holland for intentionally interfering with MRC's existing contracts by inducing the Lessors to repudiate their leases and hindering MRC's performance of the continuous drilling program. Additionally, MRC brought claims of slander of title against Point Energy and Holland.

The defendants filed counterclaims against MRC, including one for breach of contract, based on a number of alleged failures of MRC. ~~1CR 162~~ In response, MRC raised the affirmative defense of repudiation.

## D. The Alleged Conspiracy

Following a period of discovery, MRC amended its petition to add new parties and claims based on an alleged conspiracy. The live petition includes breach of contract claims against the four mineral owners: TJ Bar, Tubb Memorial, Bank of America, and PlainsCapital. In addition to the tortious interference claims against Point Energy and Holland, the live petition makes those same claims against TJ Bar, Vortus Investment Advisors—Point Energy's financial backer—and three principals of Point Energy, John Sabia, Robert Gaudin,[9] and Bryan Moody, seemingly in their individual capacities. The new defendants generally denied MRC's allegations and filed certain counterclaims against MRC.

---

[9] MRC later filed a motion to nonsuit all claims against Robert Gaudin, which was granted. All claims against him were dismissed without prejudice.

When it signed leases with the mineral owners in June of 2017, Point Energy was a newly formed subsidiary of Point Energy Permian (PEP). PEP, Point Energy, and another company called Vine Royalty were all owned by Robert Gaudin, who also owned Holland. John Sabia revealed in his deposition that he had left employment with Holland in the fall of 2016 to work for Vine Royalty. Sabia testified that this employment change was somewhat of a technicality: he still worked for Gaudin, still worked on the same floor of the same building, and he was still involved in the interrelated business ventures owned by Gaudin. In May of 2017, Sabia helped negotiate oil and gas leases between the mineral owner lessors and Point Energy as lessee. When he communicated with the mineral owners, he signed his emails as a vice-president of Holland, acting as TJ Bar's agent. In doing so, he held himself out to be similarly situated with the other mineral owners. Negotiating these leases on behalf of Point Energy was Bryan Moody. Sabia and Moody withheld a critical fact from the other mineral owners: that they worked for the same group of companies owned by Gaudin. In essence, the other three mineral owners followed along with the purported negotiation between Sabia and Moody and signed identical leases with Point Energy. These actions are what MRC claims constitute tortious interference with the MRC leases.

### E. The Summary Judgment Motions

MRC and the defendants filed competing motions for summary judgment on whether the leases were perpetuated in their entirety by the operation of the force-majeure clauses. The trial court granted the defendants' motion and denied MRC's, ruling that the leases automatically terminated as to all lands not included in a production unit. The trial court denied defendants' motion for summary judgment regarding the size of the production unit MRC retained. The trial court also denied MRC's motion for summary judgment on the defendants' counterclaim and

granted the defendants' motion for summary judgment on MRC's repudiation defense. Finally, the trial court granted defendants' motion for summary judgment on MRC's claims of tortious interference.

## II. DISCUSSION

Following its rulings on the parties' motions, the trial court certified three controlling questions of law, which are the subject of this permissive appeal. The parties ask us to first determine whether MRC's leases terminated by May 22, 2017, as to the portion of the leasehold estate not included in a production unit for a commercial well. Next, in the event the leases terminated by May 22, the parties ask us to determine the size of each production unit retained under the relevant lease clause. Finally, if the lease did not terminate, the parties ask us to determine whether the actions of the tort defendants can support a claim for tortious interference of a contract under Texas law.

We discuss each question in turn.

### A. Standard of Review

The Texas Rules of Civil Procedure permit a trial court to grant summary judgment where there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). When both parties move for summary judgment and the trial court grants one motion and denies the other, "the reviewing court considers the summary

10

judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

## B. Contract Principles

The general principles that govern the construction of contracts also govern the construction of mineral leases. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018); *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (per curiam) (providing that oil and gas leases are contracts, and their terms are interpreted as such). We therefore review and construe mineral leases de novo, and our objective in doing so is "to ascertain the parties' intent as expressed within the lease's four corners." *Endeavor Energy*, 554 S.W.3d at 595. The analysis necessarily begins with the contract's express language. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019). Thus, we examine and consider "the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id*.

When addressing oil and gas leases, the Supreme Court of Texas has explained that where the lease "expressly defines the duty, [a court] will not impose a more stringent obligation unless it is clear that the parties intended to [do so]." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). As with contracts generally, the parties to an oil and gas lease are free to decide their contract's terms, and the law's strong public policy favoring freedom of contract compels courts to respect and enforce the terms on which the parties have agreed. *Endeavor Energy*, 554 S.W.3d at 595 (citing *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95 (Tex. 2011) ("As a fundamental matter,

11

Texas law recognizes and protects a broad freedom of contract."). Summary judgment is proper only if the parties' intent, as expressed in the language of the contract, has been conclusively established. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc*., 473 S.W.3d 296, 305 (Tex. 2015).

The dispute in this case centers on the proper interpretation of certain contractual provisions that concern continuous operations required for perpetuation of the leasehold estate, the automatic termination that occurs unless delays are excused, and the acreage retained in the event such delays are not excused. Specifically, we are asked to construe the provisions in the lease pertaining to a continuous drilling program, the force majeure clause, and the retained-acreage provision. Before we turn to the lease provisions, we set forth some basic mechanics of oil and gas leases that will guide our analysis.

In a typical oil and gas lease, the habendum clause is divided into two parts—the primary and secondary term—and governs the duration of the mineral-lease estate. *Endeavor Energy*, 554 S.W.3d at 597. A primary term usually lasts for a fixed period as agreed and stipulated by the parties. *Id.* A secondary term begins after the expiration of the primary term and typically continues indefinitely "as long as oil or gas is produced . . . ." *Id.* If the production of oil and gas ceases during the secondary term, the lease will terminate automatically. *Id.*

Notwithstanding termination provisions, a lessee may save some or all of its leasehold interest through other lease provisions. *See id.* For example, the parties may include a continuous drilling program that extends the lessee's primary term so long as it continues drilling of wells within a specified timeframe. *Id.* "Generally, under these types of clauses, 'if production results from the continuous prosecution of the very operations being engaged in by the lessees upon the

12

expiration of the primary term, the lease is good.' But the required development efforts must 'be continuous with no gap.'" *Id.* Without that continuous development, the lease usually terminates immediately. *Id.*

Likewise, a lessee does not necessarily forfeit all its interest in the leasehold estate upon termination of its leasehold interest. *See id.* If the parties included a retained-acreage clause, the leased acreage is typically divided "such that production or development will preserve the lease only as to a specified portion of the leased acreage." *Id.* at 598. This clause may work in tandem with the continuous drilling program and force the lessee to develop the entire leasehold estate or otherwise forfeit those undeveloped acres. *See id.* "Each retained-acreage clause must be construed on its own, under governing principles of contract interpretation" because the clause's effect depends on the parties' chosen language. *Id.*

The lessee may also negotiate a force majeure clause for itself to extend the above-referenced deadlines under agreed upon circumstances. "Force majeure" is a term that describes a particular type of event which may excuse performance under a contract. *See R & B Falcon Corp. v. Am. Expl. Co.*, 154 F.Supp.2d 969, 973 (S.D. Tex. 2001) (citing *Perlman v. Pioneer Ltd. Partnership*, 918 F.2d 1244, 1248 n.5 (5th Cir. 1990)). It is a contract provision that courts must construe to ascertain the parties' intentions based on the language the parties ultimately agreed upon. *See Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 202-03 (Tex. 2019). "The scope and effect of a 'force majeure' clause depends on the specific contract language, and not on any traditional definition of the term." *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.*, 157 S.W.3d 462, 466 (Tex. App.—Houston

13

[14th Dist.] 2004, no pet.); *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 n.5 (5th Cir. 1990)). Thus, we strictly construe a force majeure clause according to its terms. *Gulf Oil Corp. v. Southland Royalty Co.*, 478 S.W.2d 583, 590 (Tex. App.—El Paso 1972), *aff'd*, 496 S.W.2d 547 (Tex. 1973).

## C. Certified Question One – Force Majeure Clause

In this case, whether the lease had automatically terminated hinges on the interpretation of the force majeure clause. This clause provides as follows:

> 13. **Force Majeure**. When Lessee's operations are delayed by an event of force majeure, being a non-economic event beyond Lessee's control, if Lessee shall furnish Lessor a reasonable written description of the problem encountered within 60 days after its commencement, and Lessee shall thereafter use its best efforts to overcome the problem, this lease shall remain in force during the continuance of such delay, and Lessee shall have 90 days after the reasonable removal of such force majeure within which to resume operations; provided, however, this paragraph shall not extend this lease or relieve Lessee for liability for any breach thereof for a period in excess of 180 days, and Lessee's obligation to pay sums due hereunder shall not be affected by an event of force majeure.

The parties dispute whether the clause extended the lease upon MRC's failure to spud another well by May 21, 2017. They diverge on three main points. First, they disagree that the off-lease wellbore instability encountered by Rig 295 constitutes an event of force majeure under the lease terms. Second, they disagree about whether the force majeure event needed to cause MRC to miss its deadline. And third, they disagree about whether there are fact issues that should have prohibited the trial court from granting the Appellees' motion for summary judgment. For the reasons explained below, we agree with MRC.

### 1. Off-lease character of the triggering event

To begin, we address the first divergence: the triggering event. MRC claimed the triggering event here was the wellbore instability Rig 295 experienced in an off-lease assignment, which

14

resulted in an almost thirty-hour delay in its overall operations. Appellees argued in their joint motion for summary judgment that the triggering event under the force majeure clause cannot originate off the leasehold estate not only because of certain lease language but also due to the purpose of force majeure clauses generally. The trial court held that "the leases at issue in this lawsuit . . . were not perpetuated under the Leases' force-majeure clauses, nor were [MRC's] drilling deadlines under the Leases extended by force majeure."

MRC now argues the trial court erred by adding language and limitations the parties did not include in the lease terms, specifically that the off-lease nature of the triggering event precluded MRC from being able to invoke the force majeure clause. Appellees continue to respond that the force majeure clause requires the qualifying event to be an on-lease, unforeseeable event that is a substantial factor in the lessee's failure to meet its deadline under the lease; consequently, the location of the force majeure event precluded MRC from invoking the clause based on wellbore instability that Rig 295 remedied in this instance.

The Supreme Court of Texas held that courts cannot read into a contract a stipulation to which the parties did not agree. *See Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018). In *Murphy*, the parties agreed that if another well were drilled off-lease and within 467 feet of the lease line, the lessee could choose between paying royalties to the mineral owner, releasing that acreage, or drilling an offset well. *Id.* at 107. If the lessee opted to drill an offset well, the lease required only that the lessee exercise due diligence in drilling and that the well be drilled in the same producing formation as the off-lease well. *Id.* Once that provision was triggered, the lessee decided to drill an offset well more than 1,800 feet away from the lease line. *Id.* The mineral owner was not pleased with this decision and argued the parties intended and the industry

standard required the offset well to be near the lease line to prevent drainage. *Id.* at 107-08. The trial court agreed with the lessee, but the court of appeals reversed for the mineral owner. *Id.* at 108.

The Supreme Court reversed the court of appeals and reinstated the trial court's judgment, however. *Id.* at 114. Although it acknowledged that the industry expectation for offset wells included prevention of drainage, nonetheless, the majority concluded that "if the parties had intended the offset well to protect against drainage, the provision would presumably have included requirements regarding the direction and placement of the perforated portions of the horizontal wellbore." *Id.* at 112. The Court focused on the language of the lease at issue and determined no such stipulations were present. *Id.* at 113. Important to its decision was the lease's explicit instructions regarding the depth to which the lessee had to drill—within the same producing formation as the off-lease well—and the standard for the timeframe in which the lessee had to act. *Id.* "Ultimately, [the Court] interpret[ed] [the] lease agreement according to its express language, and . . . [did] not read into the lease more stringent obligations than the parties intend[ed]." *Id.*

Although the provision in *Murphy* differs from the clause here, the same analysis applies. "In construing an oil and gas lease, as with any contract, our task is to 'ascertain the true intentions of the parties as expressed *in the writing itself*.' This analysis begins with the contract's express language." *Id.* at 108 (emphasis added) (citations omitted). The express language in this clause has similarly specific requirements as that in *Murphy*. *Cf. id.* at 107 (providing the entire offset well provision of the oil and gas lease). For example, the lease here requires the event of force majeure to be "non-economic" and "beyond [the] Lessee's control." It requires MRC to notify the Lessors within sixty days of the triggering event's occurrence and provide a "reasonable written description

16

of the problem encountered . . . ." It gives MRC ninety days after the removal of the force majeure to resume operations. And it contemplates a maximum allowance of 180 days for any period of force majeure delay. Similar to *Murphy*, if the parties had intended the force majeure clause to only cover on-lease delays, the provision would presumably have included requirements regarding where the location of the triggering event must occur. *See id.* at 112. Despite including other specific requirements in the force majeure clause, the parties here did not include an "on-lease" condition.[10] We decline to "interpolate constraints not found in the contract's unambiguous language" now and reject Appellees' argument on this ground. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 758 (Tex. 2018).

### 2. Causation (i.e. whether the lease term required that the event delay operations)

The parties next dispute whether the triggering event must have caused MRC to miss its deadline altogether, or whether a mere delay in its operations sufficed. The relevant portion of the provision stipulates the clause may be invoked when MRC's "operations are delayed by an event of force majeure . . . ." MRC argues this language is very general and requires only a delay in its operations that need not have a direct link to its missed deadline with the Lessors. Because of the thirty-hour delay it experienced off-lease, MRC asserts its invocation of the force majeure clause was permissible and the trial court erred by requiring the triggering event to have caused MRC to miss the May 21, 2017 deadline altogether. Appellees caution that MRC's interpretation

---

[10] Although not addressed by the parties, we are further convinced of this point when we look at other specific conditions included as introductory language within the lease. For example, paragraph six of the lease, entitled "Operations," indicates that "[t]he following provisions shall apply to [MRC's] operations *on the Leasehold Estate . . . .*" (emphasis added). Among other provisions and definitions, the continuous drilling program is found under this introductory language. What is not included, however, is the force majeure clause. From this, we can see the parties both contemplated and incorporated on-lease conditions as to certain provisions but opted out of imposing such condition regarding the force majeure clause.

transforms the clause into a postponement-at-will provision. It believes MRC's construction is too expansive because it grants lessee the sole discretion to postpone the termination date of a lease for any inconvenience it experiences—regardless of whether such delay in fact caused its failure to commence drilling by May 21.

As already explained, we are bound by the lease language to which the parties agreed. *Murphy*, 560 S.W.3d at 108. We may not add conditions based on what the parties now argue they intended for the lease but failed to include in its terms. *URI*, 543 S.W.3d at 763-64, 770 ("Courts cannot rewrite the parties' contract or add to or subtract from its language.").

In *URI*, the Supreme Court of Texas reversed a court of appeals' holding that added contractual conditions not included within the parties' original agreement. *Id.* at 772. There, URI mined uranium in Kleberg County. *Id.* at 758. The parties began litigating a dispute, which resulted in a settlement agreement that permitted URI to resume mining operations after it certified that certain wells in a previously mined area had been restored to a pre-mining water quality. *Id.* at 758-59. The water quality only had to be restored if the water had been suitable for specified uses before URI began mining in that area in 1988. *Id.* To determine whether restoration was required in a specific area, URI averaged the water quality baseline data for that area using sample data from 1985 and 1987. *Id.* at 760. Based on that average, URI concluded the water quality for the previously mined area did not require restoration to levels specified in the parties' agreement. *Id.* The County sued, arguing URI breached the settlement agreement in its failure to restore the area first. *Id.* at 759. It argued only the 1985 data could be used because the 1987 data was not accessible to the public when the settlement agreement was executed. *Id.* at 763. Both the trial court and court of appeals agreed with the County's interpretation. *Id.* at 762.

18

The Supreme Court reversed, holding that the agreement was unambiguous and evidence of one party's subjective intent for the contract, which was not reflected in the agreement's terms, could not be considered. *Id.* at 769. The surrounding facts and circumstances could inform the meaning of the language in the agreement but could not be used "to augment, alter, or contradict the terms . . . ." *Id.* at 758. Because the parties failed to stipulate that only the baseline data samples from the 1985 survey could be used to determine URI's restoration obligations, the Court held the 1987 data could also be considered. *Id.* at 770. "Kleberg County bargained for a process in [its agreement], and it got just that." *Id.*

Similarly, the lease here is unambiguous and the parties failed to stipulate in the force majeure clause that MRC's triggering event had to be a substantial factor or the direct link in MRC's failure to meet the May 21 deadline. Under the terms of the lease, all that was required is that MRC's operations be delayed by a non-economic event beyond its control. The parties' agreement does not reflect that the delay had to cause MRC's failure to meet its deadline. But rather, the clause provides that when "operations are delayed by an event of force majeure, . . . this lease shall remain in force during the continuance of such delay, and Lessee shall have 90 days after the reasonable removal of such force majeure within which to resume operations . . . ." Consequently, the Lessors bargained for deadlines that could be extended by events of force majeure, "and [they] got just that." *See id.* We overrule Appellees' argument on this ground.

Moreover, even if there were a causal link requirement, there is a genuine issue of material fact regarding whether the off-lease delay caused MRC's missed deadline, or whether the delay resulted from a calendaring error by an MRC employee. Billy Goodwin's testimony indicated that the "usual" process for drilling wells eventually results in smooth and clear walls of a wellbore

19

due to the continuous tripping in and out of the hole. Only then is production casing run so it will slide in easily. Goodwin then testified that, during an off-lease drilling operation, the above-described usual practice did not occur because of an unexpected event of wellbore instability that blocked the hole and prevented his crew from running the production casing any further. He then characterized this occurrence as "extraordinary" and "unforeseeable." Thus, even if there is an implied causation requirement, we must credit Goodwin's testimony in favor of MRC as the summary judgment non-movant. *Provident Life*, 128 S.W.3d at 215. And crediting that testimony demonstrates there are outstanding, genuine issues of material fact that should have prohibited the trial court from granting Appellees' summary judgment. TEX. R. CIV. P. 166a.

### 3. Control

The Appellees also argue MRC had several choices once it encountered off-lease wellbore instability and that economic considerations drove MRC's ultimate route taken. For example, the Appellees note MRC could have stopped short of its original drilling depth goal thereby avoiding the reaming operation and subsequent delay for the last 2,500 feet. The Appellees also highlight that MRC could have engaged in additional mechanical preparation before attempting to set the casing again at that location. All of these choices, the Appellees contend, were economically driven and selected by MRC. Consequently, they argue the force majeure event was both under MRC's control and driven by financial considerations, which renders the wellbore instability an event that is outside the force majeure clause's scope. Even if we take every assertion as true, all the argument accomplishes is establishing a genuine issue of material fact that should have prohibited the trial court from rendering judgment as a matter of law. TEX. R. CIV. P. 166a; *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004) ("Right to control may be shown by explicit contractual assignment

20

or actual exercise of control. Generally, the former is a question of law for the court and the latter a question of fact for the jury."); *Painter v. Sandridge Energy, Inc.*, 511 S.W.3d 713, 720 (Tex. App.—El Paso 2015, pet. denied) ("Whether one party exercised actual control is generally a fact issue."). The record is fraught with conflicting evidence on these points,[11] including testimony from Goodwin that "[t]he wellbore instability that [MRC] encountered was beyond [its] control." We must indulge all reasonable inferences in favor of the nonmoving party for summary judgments. *Provident Life*, 128 S.W.3d at 215. The nonmoving party here is MRC and because there is conflicting evidence regarding MRC's control over the purported triggering event, the extent of the delay encountered, and the motivation for its decisions, summary judgment was inappropriate. *See* TEX. R. CIV. P. 166a.

### 4. Notice

The Appellees next argue that in order for MRC to have successfully invoked the force majeure clause, it must have offered the Lessors a reasonable written description of the problem encountered within sixty days of its commencement. According to Appellees, the wellbore instability began on April 10, 2017, and therefore MRC's notice of June 13, 2017, was not timely. Furthermore, the Appellees highlight some potential fabrications within MRC's notice and argue these discrepancies render the notice unreasonable and outside the clause's scope. MRC retorts it had the right to invoke the clause upon any triggering force majeure event; it was not obligated to invoke it upon every delay encountered. Although it experienced some instability challenges on

---

[11] Although Point Energy argues MRC chose not to rent or otherwise obtain another rig to drill on time and in accordance with the Lessors' agreement, MRC included summary judgment evidence it had no choice but to use Rig 295 despite the delay because of the rig's specialized equipment (for efficiency) and crew (for safety). MRC also included evidence that its obligation as a lessee prohibited it from walking away from an unfinished well that required a reaming operation; it argues abandoning the well was not a choice.

April 10, it encountered a delay of greater magnitude on April 21. This, it argues, is when its sixty-day deadline commenced, and notice was therefore timely.

Regardless of the merits of each party's argument, at the very minimum this creates genuine issues of material fact that negate the Appellees' entitlement to judgment as a matter of law and render summary judgment inappropriate: namely, what date the triggering event commenced—April 10 or 21—and whether MRC's notice provided a reasonable description of the problem encountered. *See* TEX. R. CIV. P. 166a; *Nissan N. Am., Inc. v. Tex. Dep't of Motor Vehicles*, 592 S.W.3d 480, 494 (Tex. App.—Texarkana 2019, no pet.) ("[T]he interjection of the term 'reasonable' into a contract virtually always creates a question of fact. For example, in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, the Supreme Court held that a contractual attorney-fee shifting provision stating that 'the prevailing party shall be entitled to an award for its reasonable attorneys' fees' created a fact question."); *Joyner v. R. H. Dearing & Sons*, 134 S.W.2d 757, 760 (Tex. App.—El Paso 1939, writ dism'd) ("We believe a question of fact was presented as to whether the erection of the house in question was within the grant. If it was reasonably necessary to the prosecution of the activities contemplated under the lease, then the right existed; otherwise[,] it did not.").

Lastly, the Appellees argue there is an implied condition of foreseeability in all force majeure clauses in Texas. In other words, these parties do not believe MRC invoked the force majeure clause correctly because reaming operations are very common in the oil and gas industry and force majeure clauses are not triggered by foreseeable events. Not only do the Appellees mischaracterize the triggering force majeure event, which is the wellbore instability itself, but it also asks us to write in yet another condition to the lease for which the parties did not agree.

22

Even so, the record before us includes testimony regarding the foreseeability—or lack thereof—and magnitude of the wellbore instability Rig 295 encountered. Dee Smith—MRC's Operations Superintendent—testified in his deposition that Rig 295's reaming operation was "a special event." Joshua Passauer—MRC's Area Drilling Manager—testified in his deposition that the wellbore instability "was highly unusual" and not something he anticipated based on his experience drilling in that area. DJ Ponville—an expert petroleum engineer—swore in his affidavit that the wellbore instability was beyond MRC's control, "unpredictable," and "extremely rare . . . ." Therefore, even if Texas caselaw indeed implies a foreseeability component in all force majeure clauses, which we do not decide, this yields yet another fact question that renders the trial court's summary judgment ruling inappropriate under the circumstances. *See Rodriguez v. Cemex, Inc.*, 579 S.W.3d 152, 164 (Tex. App.—El Paso 2019, no pet.) (holding there was sufficient summary judgment evidence to raise a question of fact regarding the foreseeability of the injury alleged).

Because we must strictly construe only the language included within the force majeure clause, we agree with MRC that off-lease delays can fall within this clause's scope and such delays are not required to be a substantial factor in MRC's failure to meet its deadline. Furthermore, there are fact issues that must be determined by a jury. The trial court therefore erred in granting the Appellees' motion for summary judgment on these grounds; we reverse and remand the trial court's ruling that as a matter of law the lease terminated on May 22, 2017, and the force majeure clause could not save the lease from termination. Because there remains a genuine issue of material fact, we affirm the trial court's denial of MRC's motion for summary judgment on this issue.

Two other summary judgment rulings by the trial court were dependent upon this controlling question. Because there remains a genuine issue of material fact as to whether the lease

was perpetuated in its entirety, we affirm the trial court's denial of MRC's motion for summary judgment on the defendants' counterclaim, and, for like reasons, we reverse the trial court's granting of the defendants' motion for summary judgment on MRC's repudiation defense to that counterclaim.

### D. Certified Question Two – Production unit size

The next issue certified by the trial court asks us to determine how many acres MRC may retain once its lease terminated. The parties included a retained-acreage clause in the lease: "At the expiration of the primary term, this lease shall automatically terminate as to all lands and depths of the Leasehold Estate not then included in a Production Unit containing a Commercial Well . . . ." Under this clause, the parties agreed that, upon termination, MRC may only retain the minerals then-included in the "Production Unit . . . ." The lease continues, "[F]or an oil well that is a horizontal well, the Production Unit shall not exceed 160 acres plus 10% tolerance if less than 5000 feet of its wellbore extends horizontally in the producing formation . . . ." The production unit "shall not exceed 320 acres plus 10% tolerance if more than 5000 feet of its wellbore extends horizontally in the producing formation . . . ." Finally, the parties agreed that within "90 days from the date of completion of a Commercial Well, Lessee shall file for record in the county where the well is located a written designation of the Production Unit for the Commercial Well, and a copy of the designation showing recording information shall be promptly furnished to Lessor."

The Appellees filed a motion for summary judgment asking the trial court to construe the unambiguous language of this provision and conclude that a wellbore should be measured from the first take point to the last in order to determine whether the wellbore extended horizontally in the production formation for more than 5,000 feet. Appellees also asked the trial court to conclude

24

that MRC's failure to record a written designation for each well barred MRC from claiming more than the 160 acres plus 10% tolerance. MRC argues the Appellees' interpretation of the lease terms adds stipulations on which the parties did not initially agree. Moreover, MRC believes its failure to comply with the recording requirement permits Appellees to recover only damages under a claim for breach of contract because that provision is a covenant that does not impose forfeiture as a penalty. The trial court rejected Appellees' arguments and denied their motion for summary judgment on this issue. Appellees challenge this ruling.

The parties diverge in two ways here. First, the parties disagree on how to measure the length of the wellbore, which dictates whether MRC may retain 160 or 320 acres plus 10% tolerance. This disagreement hinges on the proper construction of "extends horizontally in the producing formation . . . ." Second, the parties disagree whether the recording requirement that MRC failed to complete is a covenant, condition, or a special limitation, which determines whether MRC forfeited any additional acreage to which it was otherwise entitled. For the reasons explained below, and on our motion, we cannot resolve these arguments.

A court without subject matter jurisdiction cannot resolve any legal or factual issues in a case. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 103 (Tex. 2012) (Lehrmann, J., concurring in part and dissenting in part). A lack of subject matter jurisdiction cannot be waived, can be raised at any time, and may be considered by a court sua sponte. *Id.* Ripeness is one component of subject matter jurisdiction that a court should consider when determining whether it has jurisdiction over a case. *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex. 2000).

"While standing focuses on the issue of *who* may bring an action, ripeness focuses on *when* that action may be brought." *Id.* at 851. We must ask whether, at the time the lawsuit was filed,

there are facts indicating an injury has occurred or is likely to occur. *Id.* at 851-52. "By focusing on whether the plaintiff has a concrete injury, the ripeness doctrine allows courts to avoid premature adjudication, and *serves the constitutional interests in prohibiting advisory opinions*." *Id.* at 852 (emphasis added). A court lacks subject matter jurisdiction when its determination of whether a plaintiff has a concrete injury "depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.*

Here, we are asked to determine, pursuant to the parties' agreement, the amount of acreage MRC may retain when, and if, its lease terminated. Although this would have been an appropriate question of contract interpretation had we determined that MRC's lease had terminated as a matter of law on May 22, 2017, genuine issues of fact preclude such determination. To reach the question about the quantity of acreage that MRC was entitled to retain, we would need to rely on "contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.* Namely, we must imagine a scenario in which MRC's lease in fact terminated.

"For this Court to eschew the ripeness doctrine" and resolve the retained acreage question when the lease may not terminate at all "would create an impermissible advisory opinion." *Id.* at 853. "Neither this Court, nor the trial court, has the power to counsel a legal conclusion on a hypothetical or contingent set of facts." *Id.* Because there is uncertainty surrounding the continued existence of MRC's lease, *cf. id.* at 852 (holding trial court did not have subject matter jurisdiction to determine constitutionality of standardized testing impact on minority children because of uncertainty surrounding the testing results that were not yet available), we decline to address this issue and do not reach the merits of either party's argument, nor do we reach a review of the trial court's denial of the defendant's motion for summary judgment on this issue. *See* TEX. R. APP. P.

26

47.1.

### E. Certified Question Three – Tortious Interference Claims

The trial court's third certified question is whether the Point Energy leases and/or certain acts related thereto by Point Energy, TJ Bar, Vortus, Sabia and Moody (collectively, the tort defendants) support claims for tortious interference of an existing contract. Below, the trial court granted the tort defendants' motion for summary judgment, dismissing MRC's tortious interference claims. The elements of tortious interference with a contract are: (1) the existence of a valid contract subject to interference; (2) willful and intentional interference by a third party; (3) proximate causation; and (4) that the plaintiff suffered actual damage or loss. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). In dismissing the claims, the trial court's summary judgment order explicitly addresses the first and fourth elements.

Collectively, the tort defendants advance three arguments in support of the trial court's summary judgment ruling: (1) MRC cannot establish a prima facie claim of tortious interference against any of the defendants; (2) the Point Energy leases are top leases, and as such, cannot tortiously interfere with the MRC leases; and (3) alternatively, if MRC can make a prima facie case of tortious interference and the Point Energy leases were not top leases, the defendants were legally justified in their interference.

MRC challenges the trial court's grant of summary judgment, asserting that it established a prima facie case of tortious interference, that the Point Energy leases were not top leases at the time of the alleged interference, and that the tort defendants' interference was not justified. We address these three arguments in turn.

#### 1. Prima Facie Case

27

A defendant may obtain a summary judgment dismissing a claim of tortious interference with an existing contract in one of two ways: either by disproving one or more elements of the claim as a matter of law, or by showing that after a reasonable time for discovery, the plaintiff can show no evidence of one or more of the elements. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (holding that defendant conclusively disproved one element of tortious interference); *Hansen*, 525 S.W.3d at 691 (holding that plaintiff failed to present evidence of one of the elements of tortious interference).

Notably, regarding mineral owner TJ Bar, MRC readily concedes that because TJ Bar was not a stranger to its own lease with MRC, it cannot be held liable for interference with that agreement. *See Hansen*, 525 S.W.3d at 690 (a tortious interference defendant must be a stranger to the contract with which he allegedly interfered). Even so, MRC asserts that TJ Bar remained a stranger to the leases MRC held with the other Lessors and could be held liable for its interference with those leases. Following *Hansen*, we agree with MRC and the court below, that TJ Bar cannot be held liable as a matter of law for tortious interference with TJ Bar's own contract with MRC. *See id*. Yet, if all required elements are otherwise proven, TJ Bar remained a stranger to the other three leases and can be held liable for their interference with those contracts. *See id*. With that one exception noted, we next address the remaining claims of tortious interference.

### a. The Existence of a Valid Contract Subject to Interference

First, it is undisputed that—at least until May 21, 2017—four valid contracts existed between MRC and the four mineral owners: TJ Bar, Tubb Memorial, PlainsCapital Bank (as trustee for the Deborah Jackson Revocable Trust), and Bank of America (as trustee for three related trusts). We have already held that there remains a fact issue as to whether the MRC leases

28

automatically terminated on May 21, 2017, or whether the leases remained in force for additional days because of the force majeure clause. If the lease did not automatically terminate, this element of MRC's claim would be conclusively established. By extension of our determination that there is a genuine issue of material fact as to the applicability of the force majeure clause—which thereby implicates the validity of the MRC leases at the time of the alleged tortious interference— we similarly conclude there is a genuine issue of material fact as to whether there existed a valid contract subject to interference.

### b. Willful and Intentional Interference by a Third Party

Regarding the second element, we must determine whether there is evidence creating a genuine issue of material fact that the tort defendants willfully and intentionally interfered with at least one of the MRC leases. Ordinarily, we would review the record searching for a genuine issue of material fact regarding each of the six tort defendants, ensuring that prima facie evidence existed for each one. However, after referencing the live pleading, the tort defendants' joint motion for summary judgment, MRC's response to the joint motion, and all appellate-level briefing on this issue, we note the parties never address this element on an individual basis. Instead, MRC alleges that the tort defendants' concerted actions collectively establish prima facie evidence of this element. And the defendants challenge other elements of the cause of action and otherwise argue the leases were top leases and raise the defense of justification. Similarly, as mentioned above, the trial court did not separate the defendants and analyze this element separately as to each one. As a result, we determine on a collective level that there remains a genuine issue of material fact as to this element. Although there may be arguments and rulings to be made below that certain defendants did not act willfully or intentionally to interfere with the MRC leases, those arguments

29

have not yet been made nor developed.

However, without searching the entire record to find each piece of evidence of an element that has not been individually briefed for each defendant, we nonetheless conclude there are genuine issues of material fact for most, if not all, of the tort defendants on this element. For example, there is record evidence that Point Energy—through the actions of Sabia, Moody, and possibly Vortus—willfully and intentionally interfered with MRC's leases. This element can be satisfied by a defendant's execution of a contract with a party and "proceeding to carry out such contract, knowing that the party's performance of its contract with the defendant would be contrary to and in violation of the party's contract with the plaintiff . . . ." *Fitness Evolution, L.P. v. Headhunter Fitness, L.L.C.*, No. 05-13-00506-CV, 2015 WL 6750047, at *23 (Tex. App.—Dallas Nov. 4, 2015, no pet.).

The tort defendants argue they had no way to know MRC would later claim "force majeure," and thus, could not have known that their leases would be contrary to MRC's leases. But there is evidence to the contrary. For example, Point Energy's leases use identical force majeure language as the MRC leases. Both the Point Energy and MRC force majeure clauses provide a 60-day window after the commencement of an event of force majeure for the lessee to provide a written description of the problem encountered, to use its best efforts to overcome the problem, and for the lessee to have 90-days after the reasonable removal of such force majeure within which to resume operations; provided, however, that the force majeure event shall not extend the lease for a period in excess of 180 days.

Viewing the evidence favorable to MRC, as we must, a jury could find that the tort defendants understood the operation of the force majeure clause, specifically that MRC had a

prescribed period—even after the May 21 spudding deadline—where it could have given the Lessors notice of a force majeure event and thereby extended its deadline per lease terms. Additionally, the tort defendants did learn of MRC's invocation of the force majeure clause through the June 13, 2017 letter from MRC to the lessors, to which Point Energy replied by June 15, 2017. After MRC's invocation of the force majeure clause, Point Energy responded by asserting the validity of its own leases and threatened MRC not to enter any portion of the leasehold estate that MRC did not otherwise retain through an existing production unit.

Regarding Sabia and Moody, Sabia admitted that he and Moody hid Point Energy's relationship with Holland, and thus Point Energy's relationship with TJ Bar, from the other three Lessors. Sabia was able to do so because he still had access to his Holland email, even though he no longer worked for Holland. They also hid Sabia's ties to Point Energy while Sabia was helping negotiate the Point Energy leases, purportedly on behalf of TJ Bar, and—by extension—the other three Lessors. However, as the tort defendants point out in their joint motion for summary judgment, "the general rule is that a corporation's agent cannot tortiously interfere with the corporation's contract, except under limited circumstances." *Hansen*, 525 S.W.3d at 690. Similarly, "[b]ecause a corporate officer's acts on the corporation's behalf usually are deemed corporate acts, a plaintiff must show that the agent acted solely in his own interests" in order to have a viable claim for tortious interference against him individually. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 457 (Tex. 1998) (citing *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997)). If a jury finds that the MRC leases did not terminate by May 22, 2017, there are fact issues remaining as to which corporation(s) Sabia and Moody were employed by, whose interests they were working on behalf of at the time of their alleged interference, and of course,

31

whether their actions rose to the level of tortious interference. As a result, there remain genuine issues of material fact on this element with regard to Sabia and Moody.

Moving to Vortus, it was Point Energy's financial backer. Individuals from Vortus sit on Point Energy's board of directors. There is evidence that Vortus was "intimately involved" with Point Energy's transaction with the Lessors. As a result, to the extent that Point Energy may have tortiously interfered with MRC's leases, there remains a fact issue as to Vortus' involvement as well.

As a matter of law, TJ Bar could not have tortiously interfered with TJ Bar's lease with MRC. *See Hansen*, 525 S.W.3d at 690 ("[t]o be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered."). MRC concedes this point. But as MRC points out, TJ Bar was a "stranger" to the other three MRC leases. In this context, a "stranger" encompasses any third party to a contract. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). Although TJ Bar knew about the other three MRC leases—and executed a virtually identical contract with MRC—TJ Bar was a stranger to the other three MRC mineral leases. *Id*.

Andy Mueller testified as TJ Bar's corporate representative in this case. Mueller testified that TJ Bar knew of John Sabia's interest in Point Energy, yet he failed to disclose—or require Sabia and Moody to disclose—that interest. TJ Bar's omission is at least evidence that, if a jury finds Point Energy liable for tortious interference, TJ Bar could be considered equally liable as co-conspirator.

In summary, we conclude that there remain genuine issues of material fact regarding whether the tort defendants willfully and intentionally interfered with the MRC leases.

### c. Causation

Moving to the third element of tortious interference, we must determine whether MRC's damages were caused by the tort defendants' interference. The tort defendants argue any damages MRC experienced must be attributed to MRC's own decisions—not to the Lessors' making of subsequent leases with Point Energy. The tort defendants assert that MRC's corporate representative conceded that the Point Energy leases did not cause either the delay in drilling on-lease or the shift in drilling schedule that precluded batch drilling on-lease. But MRC points out that the same witness testified that the Lessors' repudiation of MRC's lease did cause MRC to alter its drilling plans, resulting in damages. Because there is conflicting testimony over whether MRC's damages were caused by the tort defendants' actions, MRC has produced evidence creating a genuine issue of material fact on this element.

### d. Actual Damage or Loss

Under the fourth element, we must determine whether MRC has created a fact issue as to its actual damages or loss. *Hansen*, 525 S.W.3d at 689. Viewing the evidence as we must, MRC met its summary judgment burden. As a result of the disagreement over its continued interest in much of the leasehold estate, MRC has only been able to drill on the portions of the leasehold estate that it undisputedly still holds—the portion that was covered by the retained-acreage clause in its leases with the mineral owners. MRC alleges that this limitation has resulted in rerouting, disruption, and lost-efficiency costs, and has provided documentation of those costs.

The tort defendants argue that MRC stipulated in court that it can only assert nominal damages for tortious interference. But that stipulation was made only after—and specifically in light of—the trial court's prior ruling that the force majeure clause did not apply and the MRC

leases had terminated on May 21, 2017. Because we have reversed the trial court's force majeure ruling, MRC's stipulation no longer has effect. MRC has presented evidence creating a genuine issue of material fact as to actual economic damage.

In sum, the evidence demonstrates there remain genuine issues of material fact regarding each of the four elements of MRC's tortious interference claims against the tort defendants.

### 2. Top Leases

Point Energy asserts that its lease with TJ Bar was always a top lease, and that it later converted the other three leases into top leases. Point Energy then argues that top leases cannot interfere with existing oil and gas leases. However, MRC points out that Point Energy's assertion about the TJ Bar lease always being a top lease is false. The original lease with TJ Bar, which was effective on June 7, 2017, was a traditional lease. It was not until June 14—one day after MRC's force majeure letter—that Point Energy and TJ Bar signed a lease designated as a top lease. Similarly, Point Energy's original leases with the other three mineral owners were not designated as top leases, but were only converted to top leases in August of 2018, well after this litigation began.

Additionally, the June 15 letter from Point Energy to MRC does not mention that Point Energy signed top leases with the mineral owners. To the contrary, Point Energy's letter makes clear that Point Energy believed itself to be the rightful lessee of the disputed acreage. The letter states that "[t]he primary terms [of the MRC leases] have expired, and MRC is obligated to release all of its interest in the leases outside specified production units . . . ." The letter goes on to state "[Point Energy] took leases from the mineral owners." The letter challenges MRC's invocation of the force majeure clause and warns MRC that any entry upon the land may constitute bad-faith

trespass. All of these facts and inferences, when viewed favorably to MRC, could allow a jury to find that the Point Energy leases were traditional leases, as opposed to top leases.

### 3. Justification Defense

As an alternative argument to support the trial court's summary judgment, the tort defendants argue they were legally justified in any interference. "Even if a plaintiff establishes the elements of [tortious interference with an existing contract], a defendant may still prevail upon establishing the affirmative defense of justification." *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). When a defendant asserts this affirmative defense, the burden shifts to him to prove the defense. *Hansen*, 525 S.W.2d at 697. Legal justification is based on the exercise of either one's own legal rights or "a good-faith claim to a colorable legal right," even if that claim later proves to be mistaken. *Texas Beef*, 921 S.W.2d at 211; *Hansen*, 525 S.W.3d at 697. Only the first method—justification based on one's own legal rights—can establish the defense as a matter of law. *Hansen*, 525 S.W.3d at 697. The second method—justification based on a good-faith claim to a colorable legal right—can only be established if "the jury finds that, although mistaken, the defendant exercised that colorable right in good faith." *Id*. The justification defense "does not apply when the interference is by illegal or tortious means, such as misrepresentation or fraud." *Id*.

Because we have determined that there is a genuine issue of material fact as to whether the MRC's leases were still valid when the new leases were negotiated and signed, we cannot say as a matter of law that the tort defendants were exercising their own legal rights. Because we have determined that there is a genuine issue of material fact as to each element of MRC's tortious interference claims, the tort defendants' only other avenue to a justification defense is through a

35

jury's finding on whether their actions were in good faith, based upon a colorable legal right. *See Hansen*, 525 S.W.3d at 697. Therefore, to the extent the trial court dismissed MRC's claims of tortious interference based on the justification defense, we conclude that it erred.

Except for any claim against TJ Bar for tortiously interfering with its own lease with MRC, the trial court erred in granting the tort defendants' motion for summary judgment dismissing MRC's tortious interference claims. And we further conclude that there remains a genuine issue of material fact as to each element of MRC's claims against each defendant and no defendant can prove a justification defense as a matter of law.

### III.   CONCLUSION

We reverse and remand the trial court's summary judgment which concluded as a matter of law that MRC's leases automatically terminated on May 22, 2017. We affirm the trial court's denial of MRC's motion for summary judgment on the defendants' counterclaim but reverse the trial court's granting of defendants' motion for summary judgment on MRC's repudiation defense. We decline to address the trial court's second certified question regarding the size of the production units because we lack jurisdiction to do so. Finally, as for MRC's tortious interference claims, we affirm in part and reverse and remand in part. We affirm in part the trial court's narrow ruling that TJ Bar cannot be held liable for tortious interference with its own lease with MRC. We reverse and remand in part the remainder of the trial court's ruling on this issue in accordance with this opinion.

GINA M. PALAFOX, Justice

April 28, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.
Alley, J., concurring and dissenting

36